UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO. 07-165 (ADM/JSM)

　　　　Plaintiff,

v.                                           <u>REPORT AND RECOMMENDATION</u>

TODD RICHARD LADOUCER (1),
JEANNE MARIE FINCH (2),

　　　　Defendants.


JANIE S. MAYERON, United States Magistrate Judge

　　　　The above matter came on before the undersigned upon (1) defendant Todd Richard Ladoucer's motions to Suppress Statements, Admissions and Answers [Docket No. 33], to Suppress Eyewitness Identification [Docket No. 34], and Second Motion to Suppress Statements [Docket No. 61], and (2) defendant Jeanne Marie Finch's Motions to Suppress Eyewitness Identifications [Docket No. 55], and to Suppress Statements.[1]

　　　　Erica MacDonald, Assistant United States Attorney, appeared on behalf of the United States of America; Paul Schneck, Esq. appeared on behalf of defendant Todd Richard Ladoucer, who was personally present; and Caroline Durham, Esq. and Wolanda Shelton, Esq. appeared on behalf of Jeanne Marie Finch, who was personally present. The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

---

[1]     At the hearing on the motions on July 3, 2007, counsel for defendant Jeanne Marie Finch verbally moved for suppression of statements.  Tr. 30.  There is no written motion.

Based upon the pleadings, the pre-hearing submissions, exhibits submitted at the hearing on July 3, 2007, and testimony taken from Sergeant Patricia Englund of the St. Paul Police Department and Special Agent Andrew Hromyak of Alcohol, Tobacco and Firearms, it is recommended that defendant Todd Richard Ladoucer's motions to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 32], to Suppress Statements, Admissions and Answers [Docket No. 33], to Suppress Eyewitness Identification [Docket No. 34],  and Second Motion to Suppress Statements [Docket No. 61], and (2) defendant Jeanne Marie Finch's Motions to Suppress Eyewitness Identifications [Docket No. 55] and to Suppress Statements, be **DENIED**.

## I.    FACTUAL BACKGROUND

Special Agent Hromyak testified that in the Fall of 2006, the St. Paul Police Department and Alcohol, Tobacco and Firearms ("ATF") set up a storefront operation on the east side of St. Paul to deal with some of the ongoing crime problems on the east side.   Tr. 50.   ATF and the St. Paul Police Department utilized a confidential informant ("CI"), who secured a store and moved some of his personal belongings in there with the intention of operating a thrift store.   Tr. 50.   The CI was a person who had been previously used by the ATF in several different offices around the country. Tr. 89.   The store was equipped with cameras, which were made to look like motion detectors, and microphones.   Tr. 51.   The CI consented to the recording of the transactions.   Tr. 51.   Defendant Jeanne Finch ("Finch") had previously had a thrift or antique store in St. Paul, and engaged in a cooperative arrangement with the CI to sell

some of her own items in the store.  Tr. 51-52.  Finch had met with the CI a couple of weeks prior to October 24, 2006.  Tr. 52.

The CI had been meeting with people at the store and around the neighborhood of the store, and had put out the word that he was not able to purchase a gun himself, and was interested in purchasing guns from other sources.  Tr. 52-53. The CI had mentioned this to Finch.  Tr. 53.  On October 24, 2006, Finch told the CI that a friend of hers, Gloria Forga, knew of someone who had a couple of guns that they would be willing to sell.  Tr. 53.  The CI relayed this information to Special Agent Hromyak, who told the CI to see if he could make arrangements to view the guns at Forga's apartment located at XXXX Lawson Avenue.  Tr. 53.  The CI went to the apartment, called Special Agent Hromyak from the apartment, and spoke in a manner indicating that he were speaking to a gun buyer.  Tr. 53.  Special Agent Hromyak told the CI to see if he could arrange a deal for the following day at the store so that it could be captured on videotape.  Tr. 54.  Several minutes later, Special Agent Hromyak received another phone call from the CI during which the phone line was open but no one responded to Special Agent Hromyak.  Tr. 54.  Special Agent Hromyak could hear a conversation between the CI and another male, and it sounded like they were moving in a car.  Tr. 54.  Special Agent Hromyak heard the CI say that he was prohibited from possessing firearms because he had picked up a domestic violence conviction in his past, and heard him ask the other person what his felony convictions were for.  Tr. 55.  Special Agent could hear another male voice respond, but could not make out the specifics of what he was saying.  Tr. 55.  Special Agent Hromyak had no way of  knowing who the other person in the car was just from

listening to the conversation.  Tr. 88.  However, Special Agent Hromyak testified that the voice of defendant Todd Ladoucer ("Ladoucer") was consistent with the voice he heard during this phone call.  Tr. 123.  Special Agent Hromyak did not record either of the two phone calls.  Tr. 54.

The CI then called Special Agent Hromyak a third time, and told him that he was now alone and that he had the guns in his possession.  Tr. 56.  The CI said that they had been fronted to him, meaning that they had been given to the CI before receiving payment, on the condition that payment would be made.  Tr. 56.  The agreed-upon price for the guns was $600, with a $50 finders-fee to Finch for brokering the deal.  Tr. 56.  The CI set up a meeting at the store for October 25, 2006 to pay for the guns.  Tr. 56.  A couple of agents met with the CI ahead of time to provide him with the buy funds and to give him instructions on what to do, and a number of agents were in the area of the storefront to provide safety in case anything went wrong.  Tr. 56.  Other agents monitored the location from an audio-video listening post off-site. Tr. 56.  Finch, Ladoucer and another individual identified as FNU LNU entered the store and remained in the store for approximately 15 to 20 minutes.  Tr. 56-57.  The encounter was recorded.  See Gov't Ex. 1.  The Court has reviewed the recording of the encounter in its entirety.  The tape clearly shows Ladoucer, Finch and FNU LNU in the store together, discussing the matter of the guns with the CI, including the fact that they were stolen from a house occupied by a man who was on a trip to Japan.  Their conversation is audible.  At one point, the CI counts out $600 and gives it directly to Ladoucer as payment for the guns.  The CI, Finch and Ladoucer also discuss the $50 finders-fee for Finch's role in the transaction.

Special Agent Hromyak testified that after the October 25, 2006, meeting, law enforcement followed Finch's car, which contained Finch, Ladoucer and FNU LNU back to the address on Lawson, which was believed to be the residence of Forga.  Tr. 95-96.

On February 21, 2007, Special Agent Bob Schmidt of ATF met with the CI.  Tr. 60.  Prior to the meeting, the CI had given law enforcement a description of Finch, stating that she was a woman in her fifties who wore makeup and a lot of hairspray in her hair, with a first name of Jeanne and a last name of Finch.  Tr. 60-62.  The CI also provided a cell phone number with which he had contacted Finch.  Tr. 60.  Special Agent Hromyak testified that he too had seen Finch at the store on a couple of occasions, and his observation of Finch was consistent with the CI's description of her.  Tr. 62.  Based on the information given to them by the CI, as well as Special Agent Hromyak's observations, ATF was able to obtain a booking photograph of Finch by using her first and last name and date of birth.  Special Agent Schmidt met with the CI on February 21, 2007, showed him the booking photo and asked if he knew the person in the photo.  Tr. 63.  See Ex. 2.  The CI identified the person in the photo as the person he knew to be Jeanne Finch, and said he was one hundred percent certain that the person in the photo was Finch.  Tr. 63.  Prior to being shown the photo on February 21, 2007, the CI had the opportunity to view and interact with Finch over a dozen times.  Tr. 69, 92.  Prior to the events on October 24 and 25, 2006, the CI had met with Finch twice.  Tr. 52.

Special Agent Hromyak testified that he did not use photograph lineups when he asked the CI to identify Finch from the booking photo because the CI had close

continuing contact with Finch and because Special Agent Hromyak and his supervisor had seen Finch themselves in the store.  Tr. 127.  Further, Special Agent Hromyak stated that there is no requirement for the ATF to do a six-pack photo lineup where a person had close and continuing contact with an individual.  Tr. 127.

On March 5, 2007, Special Agent Hromyak and a St. Paul Police officer met with the CI.  Tr. 64, 66.  Prior to the meeting, the CI had described Ladoucer to Special Hromyak stating the individual's first name was Todd, that he had a shaved head, a couple of tattoos, and a stocky build, and that he was the boyfriend of a woman named Gloria Forga who resided on the 600 block of Lawson in St. Paul.  Tr. 65.  The CI had seen Ladoucer at least twice, once on October 24, 2006 and again on October 25, 2006.  Tr. 65.  Special Agent Hromyak obtained from Ramsey County or Dakota County a copy of a booking photo.  Tr. 65; see Ex. 3.  After receiving the photograph, Special Agent Hromyak and the officer met with the CI, placed the photo in front of him with the name covered and asked the CI if he could identify the person in the photo.  Tr. 66.  The CI identified the person as Todd Ladoucer, but with a lot more hair.  Tr. 66.  When the CI was asked what his level of certainty was that it was Ladoucer, Special Agent Hromyak said that he asked the CI if he remembered the transaction or what contact he had with Ladoucer, and the CI responded that Ladoucer was the man the CI paid for a couple of guns.  Tr. 66, 94.  Special Agent Hromyak also had determined that Ladoucer was the boyfriend of Gloria Forga at that time.  Tr. 67.  On cross-examination, Special Agent Hromyak stated that it was possible that he should have used a photo lineup rather than a single photograph when he asked the CI to identify Ladoucer.  Tr. 133.

On May 18, 2007, Special Agent Hromyak interviewed Ladoucer at the Ramsey County Workhouse along with Special Agent Jamie Severson of the ATF.  Tr. 69.  The agents were not wearing weapons in the interview.  Tr. 69-70.  The interview took place in a room approximately 8 feet by 8 feet and contained a small desk.  Tr. 70.  Ladoucer was seated at one end of the desk, Special Agent Hromyak was seated across the desk on the other side, and Special Agent Severson was sitting with his back against the wall.  Id.  Both agents were dressed casually.  Tr. 70-71.  Ladoucer was not touched at any time during the interview.  Tr. 70.  Ladoucer was not informed of his <u>Miranda</u> rights at any time prior to the interview or during the interview.[2]  Tr. 71.  The agents did not yell at Ladoucer during the interview, nor did Ladoucer ever yell at the agents.  Tr. 72.  The agents did not threaten Ladoucer.  Tr. 72.  Ladoucer never asked for an attorney, and never refused to answer any questions that the agents asked.  Tr. 72-73.  Special Agent Hromyak thought that Ladoucer was of average intelligence, did not appear to be intoxicated in any way, and gave appropriate responses to the questions asked of him.  Tr. 73-74.  Ladoucer was not restrained during the interview.  Tr. 79.

During this interview with Ladoucer on May 18, 2007, Ladoucer said that he was dating Gloria Forga, and admitted that he was the individual engaged in the gun transaction.  Tr. 125,128.

The interview ended when the agents had come to the end of their questioning and were waiting to see if a writ had arrived at the workhouse so that they could arrest

---

[2]   According to Special Agent Hromyak, he did not realize that he had forgotten to <u>Mirandize</u> Ladoucer until he was in the parking lot of the workhouse after the interview.  Tr. 71.

Ladoucer and take him to an initial appearance in federal court.  Tr. 74.  Once he discovered the writ had not arrived, Special Agent Hromyak told Ladoucer he might have to return in a week or so, but that they would leave him at the workhouse in the meantime.  Tr. 74.

Special Agent Hromyak returned to the Ramsey County Workhouse on May 24, 2007, to arrest Ladoucer and bring him before a Magistrate Judge for an initial appearance.  Tr. 75.  Special Agent Hromyak secured his gun in a lockbox and met with Ladoucer in the same room where the first interview took place.  Tr. 75.  Another agent, Special Agent Nicholas Garlie, accompanied Special Agent Hromyak.  Tr. 76. Prior to speaking with Ladoucer, Special Agent Hromyak read him his <u>Miranda</u> rights from an ATF form, asked if Ladoucer understood the rights, and Ladoucer indicated that he did understand.  Tr. 76; <u>See</u> Ex. 6.  When Special Agent Hromyak asked Ladoucer to sign the form, Ladoucer said that he did not want to, because he felt that by signing the form he was admitting his guilt.  Tr. 76.  Special Agent Hromyak testified that ATF procedure does not require an agent to obtain a signature regarding waiver of <u>Miranda</u> rights prior to continuing an interview, and that if a person gives verbal acknowledgement that they understand their rights the interview can continue without the person specifically stating that he waives the rights.  Tr. 125-126.

Ladoucer did not state that he wanted an attorney during the interview.  Tr. 77. A couple of times during the interview, Ladoucer refused to answer a couple of questions by stating that he "didn't want to get into it" or that he had already discussed it before.  Tr. 77.  The interview lasted ten minutes or less.  Tr. 78.  Neither agent yelled at Ladoucer during the interview.  Tr. 78.  Ladoucer did not have any problem

tracking questions, and did not appear to be intoxicated in any way.   Tr. 78-79. Ladoucer was not restrained during the interview.  Tr. 79.

After the interview, the agents processed Ladoucer out of the workhouse facility.  Tr. 79.  The agents then secured Ladoucer in a set of leg irons and a belly chain and handcuffs, and transported him in Special Agent Hromyak's vehicle over to the U.S. Marshal cell block at the federal courthouse.  Tr. 79.

On the drive to the federal courthouse, which took about 30-35 minutes, Ladoucer and Special Agent Hromyak discussed a variety of things, including various jobs he had held around the country and friends he had met with the carnivals and concerts.  Tr. 80, 88. At one point, Ladoucer told Special Agent Hromyak that he wished he had never gone to his girlfriend Gloria Forga's house after the guns were transferred to the CI.  Tr. 80.  Special Agent Hromyak denied questioning Ladoucer; rather Special Agent Hromyak testified that they talked and Ladoucer made statements.  Tr. 111.

According to Special Agent Hromyak, Finch is approximately 45 years old and has been convicted three times of a crime punishable by a term exceeding one year. Tr. 81-82. Ladoucer is approximately 42 years old and has been convicted of a felony at least three times.  Tr. 81-82.

At the hearing on July 3, 2007, the Court also took testimony from Sergeant Patricia Englund of the St. Paul Police Department.  On May 16, 2007, Sergeant Englund and Special Agent Schmidt of ATF interviewed Finch in a conference room on the second floor of St. Paul Police headquarters.  Tr. 35.  During the interview, Finch sat at the head of the table, closest to the door of the conference room.  Tr. 36.

Sergeant Englund sat to the right of Finch, and Special Agent Schmidt sat on Finch's left.  Tr. 36.  Sergeant Englund was not armed with a weapon during the interview, and there were no weapons visible on Special Agent Schmidt.  Tr. 37.  The tone of the interview was casual, cordial and respectful.  Tr. 37.  The interview began with Sergeant Englund and Special Agent Schmidt introducing themselves, and then Sergeant Englund began asking Finch a series of biographical questions found on the top of a <u>Miranda</u> form utilized by the St. Paul Police Department.  Tr. 37-38.  After obtaining the biographical information, Sergeant Englund advised her of her <u>Miranda</u> rights.  Sergeant Englund read Finch the form in its entirety, and Finch initialed each paragraph and signed the bottom of the form, indicating that she understood her rights. Tr. 38; <u>see</u> Gov't. Ex. 4.  The interview of Finch was recorded with a hand-held digital recorder.  Tr. 40; <u>see</u> Gov't Ex. 5.

During the interview, Finch became sad and was crying, and in an attempt to change her demeanor, the interviewing officers changed the focus of the interview to an incident in which they believed Finch had been a victim.  Tr. 42-43.  During that conversation, Finch asked the officers if she should have an attorney.  Tr. 43.  The officers told her that it was her decision, and if she wanted to have an attorney present, she could have one present.  Tr. 43.  According to Sergeant Englund, Finch raised the issue of an attorney several more times during the interview and asked if she could still cooperate if an attorney was present.  Tr. 43.  Sergeant Englund told her that she could still cooperate if she had an attorney.  Tr. 43.  After specifically asking Finch if she would like to have a lawyer present, to which Finch replied, "no, it

is okay, go ahead," Sergeant Englund decided to terminate the interview because she felt that Finch was unsure.  Tr. 43.

Sergeant Englund testified that the tone of the interview was casual, and that she and Special Agent Schmidt were compassionate toward Finch.  Tr. 44.  Sergeant Englund and Special Agent Schmidt never yelled at Finch, threatened her, or touched her physically.  Tr. 44.  They did not make any promises to her other than telling Finch that if she did want to cooperate, Sergeant Englund would inform the prosecutor as to Finch's cooperation.  Tr. 44.  Finch did not appear to be intoxicated by drugs or alcohol during the interview.   Tr. 45.   Finch tracked very well, understood the questions and gave appropriate responses.  Tr. 45.  At the conclusion of the interview, Sergeant Englund explained to Finch that they were not going to ask her anymore questions, and that she could call a lawyer if she wanted to do so.  Tr. 46.  Special Agent Schmidt dialed Finch's lawyer's phone number for her, and she left the lawyer a message.  Tr. 46.  The interview lasted approximately 20 minutes.  Tr. 46.

On May 15, 2007, a federal grand jury indicted Ladoucer and Finch with Sale of a Firearm to a Prohibited Person, in violation of 18 U.S.C. § 2, 922(d), and 924(a)(2), and Ladoucer with Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  [Docket No. 1].  On July 24, 2007, the grand jury returned a superseding indictment, charging both defendants with the additional count of Sale of a Stolen Firearm, in violation of 18 U.S.C. § 2, 922(j), and 924(a)(2), and Finch with three counts of Distribution of Cocaine Base ("Crack") in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  [Docket No. 75].

II.     **ANALYSIS**

   **A.  Motions to Suppress Statements, Admissions and Answers**

   Ladoucer moves the Court to suppress the statements he made on May 18, 2007 and on May 24, 2007.   [Docket No. 33].   Finch moves to suppress the statements she made during her interview on May 16, 2007.   The Court will address each interview separately.

   **1.  <u>Ladoucer's May 18, 2007 Interview</u>**

   The Government concedes that Ladoucer was not <u>Mirandized</u> prior to his interview on May 18, 2007, and submitted to the Court that they would not offer his statements in their case-in-chief.   <u>See</u> Tr. 31; Gov't Post-Hearing Mem. at p. 18. However, the Government also stated that if Ladoucer were to testify at trial, they would want to use his statement to impeach him and on cross-examination.   Tr. 31; Gov't Post-Hearing Mem. at pp. 18-19.   Therefore, whether Ladoucer's statement was given voluntarily remains for determination by the Court.

   Coercive police activity is a necessary predicate to the finding that a statement was made involuntarily.   <u>Colorado v. Connelly</u>, 479 U.S. 157, 167, 107 S.Ct. 515, 522 (1986).   "In considering whether a [statement] was voluntary, the determinative question is whether the [statement] was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired."   <u>U.S. v. Pierce</u>, 152 F.3d 808, 812 (8th Cir. 1998) (citing <u>Sumpter v. Nix</u>, 863 F.2d 563, 565 (8th Cir. 1988) (citation omitted)).   "In making this determination, courts look at the totality of the circumstances, including the conduct of the law enforcement officials and the

defendant's capacity to resist any pressure."  Id. (citing United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990), cert. denied, 502 U.S. 829, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991)).

The Court finds that the tactics used by Special Agent Hromyak during his interview of Ladoucer on May 18, 2007 were not improperly coercive.  Special Agent Hromyak testified that he did not touch, yell, threaten, or make any promises to Ladoucer during the interview.  The tone of the interview was relaxed.  The agents were dressed casually.  Ladoucer never requested an attorney, or refused to answer any questions.  He did not appear intoxicated, and gave appropriate responses to the questions asked of him.  Although he was in custody at the Ramsey County Workhouse on an unrelated matter, he was not otherwise restrained during the interview.

In addition, regarding the general surrounding circumstances of the interview, the Court finds that the fact that the interview took place in an eight-by-eight foot, cell-like room does not warrant a finding of coercion, nor does the location of the agents in relation to Ladoucer and the door during the interview.  See United States v. LeBrun, 363 F.3d 715, 722-723 (8th Cir. 2004) (circumstances of interview were not coercive where defendant was interviewed in a small windowless room for approximately a half hour); United States v. Galceran, 301 F.3d 927, 930-31 (8th Cir. 2002) (ninety-eight minute interview in windowless conference room by two officers not found to be coercive).

In summary, in considering the totality of the circumstances of Ladoucer's interrogation, there is no evidence of coercion, and the Court does not find that

Ladoucer's will was overborne to the extent that his capacity for self-determination was impaired.  To the contrary, the circumstances surrounding Ladoucer's interview indicate that he gave his statements to the agents voluntarily on May 18, 2007.  Accordingly, Ladoucer's motion to suppress his interview on cross-examination and for impeachment purpose should be denied.

### 2. <u>Ladoucer's May 24, 2007 Interview</u>

At the May 24, 2007 interview, Special Agent Hromyak and Special Agent Garlie interviewed Ladoucer at the Ramsey County Workhouse.  Special Agent Hromyak testified that he read Ladoucer his <u>Miranda</u> rights from an ATF form prior to beginning the interview.  Ladoucer indicated that he understood his rights, but that he did not want to sign the form because he felt that by signing it, he would be admitting guilt.  During the interview, Ladoucer never indicated that he wanted to speak to an attorney.  Ladoucer was not restrained and did not appear intoxicated.  The interview at the workhouse lasted less than ten minutes, and ended when it came time to transfer Ladoucer to federal custody.

<u>Miranda v. Arizona</u> requires that an individual be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>see also</u> <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990).  Therefore, the protections afforded by <u>Miranda</u> are triggered when an individual "is both in custody and being interrogated." <u>United States v. Hatten</u>, 68 F.3d 257, 261 (8th Cir. 1995) (citing <u>United States v. Lawrence</u>, 952 F.2d 1034, 1036 (8th Cir.), <u>cert.</u> <u>denied</u>, 503 U.S. 1011 (1992)). A waiver of <u>Miranda</u> rights is valid if it

satisfies the following criteria:  "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (citing United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994)).

"The determination of whether an accused has knowingly and voluntarily waived his Miranda rights depends on all the facts of each particular case." Stumes v. Solem, 752 F.2d 317, 320 (8th Cir. 1985) (citing Fare v. Michael C., 442 U.S. 707, 724-25, 99 S.Ct. 2560, 2571-72, 61 L.Ed.2d 197 (1979)).  A waiver of Miranda rights is valid if it satisfies the following criteria: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (citing United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994)) (citation omitted).   Only if the ""totality of the circumstances surrounding the interrogation"" reveals both an uncoerced choice and the requisite level of comprehension may this Court properly conclude that the defendant's Miranda rights have been waived.  Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (quoting Fare, 442 U.S. at 725, 99 S.Ct. at 2571).

As a preliminary matter, the Court notes that there is no dispute that defendant was in custody at the time the statements were made, and that he was therefore entitled to a reading of his Miranda rights.

Ladoucer argues that since he refused to sign the Miranda rights form, he did not effectively waive his Miranda rights and it was a constitutional violation for the agents to continue questioning him.  However, a defendant's signature is not required to effectuate waiver of Miranda rights.  "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in [Miranda]."  North Carolina v. Butler, 441 U.S. 369, 373 (1979).  Like the present case, the defendant in Butler refused to sign a waiver of rights form, and proceeded to respond to questions asked of him by law enforcement.  In holding that express waiver is not required, the Supreme Court stated that the issue of waiver must be reviewed based on the circumstances surrounding the interrogation.  Id.

Here, upon considering the circumstances of Ladoucer's interview, the Court finds that Ladoucer knowingly and voluntarily waived his rights.  Special Agent Hromyak testified that he read Ladoucer his Miranda rights verbatim from a form, and that Ladoucer indicated to the agents that he understood those rights.  Ladoucer then answered questions asked of him by Special Agent Hromyak.  There was no coercive action on the part of the agents; neither Special Agent Hromyak nor Special Agent Garlie yelled at Ladoucer or physically touched him.   Ladoucer did not appear

intoxicated, and the interview lasted less than ten minutes.  Ladoucer never asked for an attorney.

Further, Ladoucer's failure to sign the rights form did not establish his invocation of his Miranda rights.  See United States v. McKinney, 758 F.2d 1036, 1044 (5th Cir. 1985) (failure to sign waiver is not invocation of rights).  To the contrary, his willingness to answer the agents' questions after being read his rights indicated that he intended to waived his Miranda rights.  See United States v. House, 939 F.2d 659, 662 (8th Cir. 1991) ("waiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of his rights.").  Ladoucer was adequately apprised of his rights under Miranda and verbally acknowledged that he understood those rights.  Refusal to sign the waiver form notwithstanding, he effectively waived his Miranda rights when he responded to the agents' questions.[3]

With regard to any statements Ladoucer may have made to the agents in the car as he was being transported to federal custody on May 24, 2007, the Court finds that those statements are also admissible.  First, as just discussed, Ladoucer had waived his Miranda rights.  The transport directly followed Ladoucer's interview at the Ramsey County Workhouse without any lapse in time, and it was not necessary to reissue Miranda warnings for the car ride.  See Stumes v. Solem, 752 F.2d 317, 320 (8th Cir. 1985) (notwithstanding a five-hour break between first and second interviews,

---

[3]     Ladoucer also claims that Special Agent Hromyak's testimony was that ATF policy "dictates a written waiver be obtained."  Def. Mem., p. 4 [Docket No. 70].  The Court finds that this mischaracterizes Special Agent Hromyak's testimony.  On re-direct, when specifically asked, "With respect to ATF policy and procedure and based on your training and experience, are you required to obtain a signature before continuing an interview?" Special Agent Hromyak replied "no."  Tr. 125.

a fresh set of <u>Miranda</u> warnings was not required for the second interview where defendant demonstrated awareness of his rights); <u>United States v. Nordling</u>, 804 F.2d 1466, 1471 (9th Cir.1986) (new warnings not required when "no appreciable time had elapsed" between two interrogations).

Furthermore, although Ladoucer remained in their custody, the agents had ceased their questioning. Therefore, the statements made in the car were not made in response to questioning, but rather were part of a dialogue between Special Agent Hromyak regarding a number of topics, and were made by Ladoucer voluntarily and spontaneously. "'Volunteered statements of any kind are not barred by the Fifth Amendment.'" <u>United States v. Butzin</u>, 886 F.2d 1016, 1018 (8th Cir. 1989) (quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 478 (1966)). <u>See</u> <u>also</u> <u>United States v. Webster</u>, 769 F.2d 487, 491-92 (8th Cir. 1985) (statements volunteered by a suspect during the course of routine arrest procedures are not the products of interrogation); <u>Stumes v. Solem</u>, 752 F.2d at 322-23 (custodial statements made on the suspect's own initiative are not subject to the safeguards of <u>Miranda</u>).

Based upon its review of the circumstances surrounding Ladoucer's May 24, 2007 interview, the Court finds that he validly waived his <u>Miranda</u> rights, and any statements that he made to the interviewing agents after the waiver were validly obtained. Therefore, the Court recommends that Ladoucer's motion to suppress the statements that he made on May 24, 2007 be denied.

### 3. <u>Ladoucer's Second Motion to Suppress Statements</u>

Ladoucer also filed a second motion to suppress statements, with regard to any statements that he made prior to, at the time of, or subsequent to his arrest.   Def. Second Motion to Suppress Statements, p. 1 [Docket No 61].

In this motion, Ladoucer argued that statements that he allegedly made to government agents or those working for the government prior to his arrest should be suppressed because they were obtained in violation of his Fifth and Sixth Amendment rights against self-incrimination and to have assistance of counsel.   Def. Second Motion to Suppress Statements, p. 1.   However, "[s]tatements made by an unsuspecting subject to a person acting undercover on behalf of law enforcement officials are not obtained in violation of the suspect's Fifth Amendment right to be free from self-incrimination."  <u>United States v. Reid</u>, 2007 WL 1452845 at * 2 (citing <u>Illinois v. Perkins</u>, 496 U.S. 292 (1990);  <u>United States v. Ingle</u>, 157 F.3d 1147, 1150 (8th Cir.1998)).  Furthermore, a defendant's Sixth Amendment right to have the assistance of counsel attaches "'at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"  <u>Ingle</u>, 157 F.3d at 1151 (quoting <u>United States v. Gouveia</u>, 467 U.S. 180, 188 (1984) (citation omitted).  <u>See also</u> <u>Salkil v. Delo</u>, 990 F.2d 386, 387 (8th Cir. 1993) (no Sixth Amendment violation where uncharged suspect made incriminating statements to cellmate who was cooperating with police).  At the time he made statements to the CI, Ladoucer had not been charged with a crime.  Therefore, any statements that Ladoucer made to the CI were not obtained in violation of his Fifth or Sixth Amendment rights, and do not require suppression.

Additionally, as part of his second motion to suppress statements, Ladoucer argued that statements made after his arrest were "unlawful and without probable cause and not in a public place and no exigent circumstances support the arrest without a warrant."  Def. Second Motion to Suppress Statements, p. 2.  Ladoucer did not expound on this statement, and the issue does not appear in his post-hearing memorandum to the Court, nor was it argued at the hearing on the motions on July 3, 2007.  Thus, this Court will only briefly address this part of Ladoucer's motion.

On May 18, 2007, Ladoucer was in the custody of Ramsey County when he was arrested and transferred to federal custody pursuant to a writ.  The Indictment in this case was issued on May 15, 2007, and a bench warrant for Ladoucer's arrest was subsequently issued on the same day.  Ladoucer's arrest was, in fact, pursuant to a warrant, and not warrantless as Ladoucer contends.  Furthermore, there is simply no question as to whether the arrest warrant was supported by probable cause.  "A warrant of arrest can be based upon an indictment because the grand jury's determination that probable cause existed for the indictment also establishes that element for the purpose of issuing a warrant for the apprehension of the person so charged."  Giordenello v. United States, 357 U.S. 480, 487 (1958).  See also Gerstein v. Pugh, 420 U.S. 103, 118 n. 19 (1975) (an indictment "conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry");  Kalina v. Fletcher, 522 U.S. 118, 129 (1997) (Fourth Amendment requirement that arrest warrants be based upon probable cause may be satisfied by an indictment returned by a grand jury).  Therefore, Ladoucer's argument that his arrest was warrantless and without probable cause is completely meritless.

Based on the foregoing, the Court recommends that Ladoucer's Second Motion to Suppress Statements be denied.

### 4. <u>Finch's May 16, 2007 Interview</u>

At the hearing on July 3, 2007, counsel for Finch orally moved to suppress statements made during her interview on May 16, 2007.  <u>See</u> Tr. 30.  Finch did not address this motion in her post-hearing brief and thus, this Court has no understanding for the basis of her motion.  Thus, the Court will only briefly discuss it.

Finch was questioned by Sergeant Englund and Special Agent Schmidt of the ATF in a large conference room at the headquarters of the St. Paul Police department. Finch's interview was recorded, and a copy of that recorded interview was admitted as Government Exhibit 5 at the hearing on July 3, 2007.  The Court has listened to that interview in its entirety.

At the beginning of the interview, Finch's handcuffs were removed.  Sergeant Englund began by asking Finch some biographical information, including her name, age, address and marital status.  Sergeant Englund then clearly read Finch her <u>Miranda</u> rights.  Finch indicated that she understood all of the rights as each right was read to her by Sergeant Englund.  Finch was also directed to initial a waiver of rights form as each right was read to her by the officer to show that she understood those rights.  <u>See</u> Ex. 4.  The waiver is dated May 16, 2007, the date of Finch's arrest.  It includes Finch's name, age, date of birth, address, and level of education.  Further, it includes the <u>Miranda</u> warning in a numbered paragraph form, with a blank next to each paragraph for an individual to initial after reading each statement.  All four paragraphs are marked with the initials "JF."  At the bottom of the form, there is a short

paragraph, which reads "The above rights have been read to me.  I have initialed each paragraph to show that I understand each of my rights.  I have received a copy of this form."  Below that paragraph is the signature of Finch, the signature of Sergeant Englund, and the date.

After the waiver was signed, the officers began to interview Finch.  The interview lasted approximately 26 minutes, and stopped upon Sergeant Englund's determination that Finch would be more comfortable if she had the assistance of an attorney.

The Court notes that there is no dispute that Finch was in custody at the time the statements were made, and that she was therefore entitled to a reading of her Miranda rights.  The Court also finds that Finch voluntarily and knowingly waived her Miranda rights.

The facts indicate that defendant's waiver was the product of free choice, and Finch has offered nothing to suggest that her Miranda rights were waived involuntarily, or that she was coerced into the waiver.  While Finch was crying during the interview, at no time during the interview did Finch indicate that she was uncomfortable or that she needed anything.  The interview stopped when Finch expressed uncertainty about having a lawyer present.  The circumstances surrounding Finch's interview were not coercive or intimidating in any manner.  The waiver of rights form was initialed, signed and dated by Finch, indicating that she fully understood her rights before the interview began.  Based upon the complete lack of evidence and argument to the contrary, the Court finds that Finch's Miranda rights were validly waived.  Therefore, Finch's motion to suppress statements should be denied.

**C.     Motions to Suppress Eyewitness Identification**

Both defendants move to suppress the eyewitness identifications by the CI. [Docket Nos. 34 and 55].   The Fifth Amendment Due Process Clause prohibits identification testimony that derives from impermissibly suggestive procedures that may lead to an irreparably mistaken identification. See Neil v. Biggers, 409 U.S. 188, 198 (1972) ("It is the likelihood of misidentification which violates a defendant*s right to due process.").   However, "suggestive procedures, without more, do not require a holding that the due process clause has been violated."   United States v. Hadley, 671 F.2d 1112, 1115 (8th Cir. 1982) (citing Mason v. Brathwaite, 432 U.S. 98, 114 (1977); Biggers, 409 U.S. at 198; Harris v. Wyrick, 644 F.2d 710, 712 (8th Cir. 1981); United State v. Anderson, 618 F.2d 487, 491 (8th Cir. 1980)).   The court must balance the corrupting effect of a suggestive procedure against the reliability of the identification to determine if testimony about the out-of-court identification and any subsequent identification violates the defendant's due process rights.   See Hadley , 671 F.2d at 1115; see also Manson , 432 U.S. at 114.

A due process challenge to identification testimony is examined in two steps. First, the court must determine whether  the identification procedure used by police was "impermissibly suggestive."   United States v. Donelson, 450 F.3d 768, 772 (8th Cir. 2006) (citations omitted); see also Graham v. Solem, 728 F.2d 1533, 1541 (8th Cir. 1984) (citation omitted).   If so, then the court must "examine the totality of the circumstances to determine whether 'the suggestive procedures created a very substantial likelihood of irreparable misidentification.'"   Donelson, 450 F.3d at 772 (quoting United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003)).   "Pared to its

essence, the second inquiry is whether the identification is reliable." Graham, 728 F.2d at 1541 (citations omitted).   Thus, testimony regarding an out-of-court identification involving unnecessarily suggestive procedures will not be excluded if the totality of the circumstances indicates that the identification was still reliable enough to prevent misidentification.  Hadley, 671 F.2d at 1115.

In this case, the CI was shown individual booking photographs of each defendant and asked to identify the person in the photograph.  In each instance, the CI identified the defendants from the photographs.  Defendants both argue that since the CI was only shown a single photograph, and not an array, the identification procedure used by the ATF was impermissibly suggestive.

Normally, using a single photograph of a defendant for identification purposes with no accompanying photographs of other persons is deemed to be  impermissibly suggestive.  See e.g. United States v. Williams, 340 F.3d 563, 566-67 (8th Cir. 2003); United States v. Patterson, 20 F.3d 801, 806 (8th Cir. 1994).  See also Simmons v. United States, 390 U.S. 377, 383-84 (1968) (danger that a witness will make an incorrect identification is increased if the police display to the witness only the picture of a single individual).  However, "when someone already familiar with a suspect is asked to comment on whether an image portrays the suspect, these concerns [of suggestiveness] are absent." Dobbs, 449 F.3d at 909.

In this case, according to Special Agent Hromyak, the CI had encountered Finch over a dozen times, including the encounter at the CI's store which lasted approximately 17 minutes.  Prior to being shown the booking photograph on February 21, 2007, the CI had provided Special Agent Hromyak with a physical description of

Finch, her phone number, and her first and last name.  Special Agent Hromyak then used that information to obtain the booking photograph.  The CI was clearly acquainted with Finch, and it was not necessary for Special Agent Hromyak to present the CI with a full photo array.  Because the CI knew Finch, any concerns of suggestiveness stemming from the single photograph were eradicated.

The CI was shown the booking photograph of Ladoucer on March 5, 2007.  The CI had met Ladoucer on at least two occasions of which Special Agent Hromyak was aware, on October 24, 2006 and October 25, 2006.  Prior to being shown the photograph, the CI knew that Ladoucer's first name was Todd, and that he was the boyfriend of a woman named Gloria Forga, who was friends with Jeanne Finch.  On October 24, 2006, the CI spent time with Ladoucer in a car on the way to obtain the guns, in Gloria Forga's home when the exchange of the guns occurred, and the next day when he saw Ladoucer again to pay him for the guns.  This is not an instance of an eyewitness only catching a brief glimpse of a defendant's face; the CI spent significant time, face-to-face, with Ladoucer on two separate days.  The CI was acquainted with Ladoucer, and to show the CI a single photograph of Ladoucer was not improperly suggestive because the CI was familiar with Ladoucer.

However, even if the Court were to find that the use of single photographs to identify Finch and Ladoucer were impermissibly suggestive, it would still conclude that the identifications were reliable.  "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at

the confrontation, and the length of time between the crime and the confrontation."
Neil v. Biggers, 409 U.S. at 199-200.  As discussed above, the CI spent a fair amount of time in the presence of both defendants.  He spoke with them in person.  He also had a unique opportunity to view the defendants at the time of the crime – he was informed of the availability of the guns by Finch, Ladoucer was involved in the transfer of the guns to the CI, and the CI paid for the guns in the presence of Finch and Ladoucer.  The CI gave physical descriptions, including the full name of Finch and first name of Ladoucer, of both defendants.  These descriptions were accurate.  The CI indicated that he was 100% certain in his identification of Finch, and that he was positive that the person in the booking photo was Ladoucer, but with a lot more hair, and was the same person that he had paid for a couple of guns.  Finally, while the length of time between the CI's encounters with Finch and Ladoucer and his identification is approximately three-and-a-half to four months, this is certainly not an unreasonable amount of time in which to remember the faces of individuals with whom one had personal contact.  See United States v. Richardson, 651 F.2d 1251, 1255 (8th Cir. 1981) (passage of three months between crime and photographic identification did not render the identification unreliable);  Howard v. Bouchard, 405 F.3d 459, 473 (6th Cir. 2005) ("Three months is not a great length of time between an observation and identification.") (citing United States v. Causey, 834 F.2d 1277, 1286 (6th Cir.1987))).  For all of these reasons, the Court finds the identifications of Finch and Ladoucer to be reliable.   Therefore, the defendants' motions to suppress eyewitness testimony should be denied.

## RECOMMENDATION

For the reasons set forth above, it is recommended that:

1.      Defendant Todd Richard Ladoucer's Motion to Suppress Statements, Admissions and Answers [Docket No. 33] be **DENIED**.

2.      Defendant Todd Richard Ladoucer's Motion to Suppress Eyewitness Identification [Docket No. 34] be **DENIED**.

3.      Defendant Todd Richard Ladoucer's Second Motion to Suppress Statements [Docket No. 61] be **DENIED**.

4.      Defendant Jeanne Marie Finch's Motion to Suppress Eyewitness Identifications [Docket No. 55] be **DENIED**.

5.      Defendant Jeanne Marie Finch's Motion to Sever Defendant and Counts [Docket No. 58] be **DENIED**.

6.      Defendant Jeanne Marie Finch's Motion to Suppress Statements be **DENIED**.


Dated:        August 30, 2007


*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **September 17, 2007** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.